I'm now arguing case 11-16-286. This is what we call the immediate repayment demand case. And the question there is to the proper mechanism by which CMS and I do have a question. There's a different lawyer's name on No, no. I'm confused. All right. Anyway, go ahead. The issue here relates to the mechanism by which FOX and CMS are now to resolve, if you will, their claims against each other for monies owed. We have argued that there is a process, the reconciliation, the so-called reconciliation process, which is set up under the regulations in 423.343. I was trying to think of what things would come up in the reconciliation where the agency owes FOX money. One thing that struck me was when a prescription is for 90 days and FOX fills it March 1, so obviously they're entitled to get paid for March, April and May. I imagine there are other things in this complicated accounting procedure they have for overhead and profits. Can you educate me on anything else where it's a pretty sure thing that FOX will be entitled to money? Yes. And I will say that. I will not claim CMS agrees with all of these. No, I want to know what you're saying. For example, just for a moment, my understanding, I mean, that would be true if the coverage depended on which day the drugs were being taken as opposed to which day the prescription was being filled. But my understanding is that the coverage is for a prescription to be filled at a certain time, so that if the prescription goes into the future, it's still the event is the prescription and it's covered by and FOX is responsible for it. No? The expectation, of course, is that when FOX is filling a 90-day prescription on March the 1, March the 1, that it's going to get paid. Well, but suppose somebody is covered by FOX on March 1 and switches their coverage to somebody else on April 1. Still, if they've gotten a prescription on March 1 for 90 days, they don't get back the prescription, right? Well, I think that's a pretty unusual event. I don't think people are – I could be corrected on this, but I believe it's an annual determination as to when FOX is covered. Well, so it could be December 1. I mean, the example still holds. The event, the responsibility is to fulfill a prescription for whatever period a prescription covers. Yes, but based upon a scheme where the expectation, obviously, is that you'll continue to be paid in April and May for that participant. Now I'm confused. When you change doctors, suppose you get a prescription filled March 1 for 90 days. You're supposed to take a blood pressure pill every day. Those are something that just continues forever. You get a new doctor April 1, and the new doctor renews the prescription, blood pressure pill, 90-day refills. The pharmacy won't refill it for you until June 1, because you've still got your March refill that FOX Insurance paid for. Now what I – I guess I hadn't realized it was an issue, but I just did from Judge Berzon's question, is FOX's payment scheme with the agency, that it gets paid for the whole 90 days based on filling the prescription March 1, even if it gets fired March 10? Or is the deal with the agency that it's only entitled to get paid through March 10 until the reconciliation process? Or is the deal that it can't get paid for any pills furnished that go from March 10 to May 31 until the reconciliation process doesn't work? I mean, I would say those are all questions at issue. There's no clear statement in the regulation as to the proper treatment of those situations. Our argument is that because the – But does the question not come up – I can come up with easier examples, Your Honor, much easier examples than this one. Just let me clarify something. The money that we're fighting over is money that – or that you're contesting should have gone to the reconciliation process. It was money that was paid on an estimated and prospective basis. In other words, on a capitation basis, right? It wasn't for any particular drugs. It was for Mr. So-and-so who was in your system. You get a certain amount of money at the beginning of each month, and later you reconcile what you actually owe each other. So the money that was not paid after March 10th was money – or that they said you owed them by after March 10th was this estimated capitation money. It wasn't money for any particular drug. Is that right? It's not for a particular drug. That's correct. It's for a person for a time period. Well, it's for a person for a time period under a scheme that's based upon the assumption that you're providing services for that coverage year. It's not for a particular drug. Some of these drugs, unlike blood pressure medicine, cost very large sums of money per week or per month. I mean, the actual costs do come into account as part of the reconciliation process. The advance payment is not based on one particular drug. I know the advance payment is so many people times this amount. But in the reconciliation, I thought it was based on the drugs. It's not? There's an element of that to it. I mean, it's a complicated formula. In any event, the reconciliation has happened. Right? The reconciliation, we have gone through. I understand you're arguing about it. But it has happened. So the question is how much of this case is a lie? What exactly about it is a lie? I understand there's an interest problem. No, we are still. But the actual question of whether there needs to be a reconciliation sounds like a dead letter issue because there is a reconciliation process. We are still pursuing the reconciliation claims. I understand that. But that's not what this case is about. It's not about a contesting of the outcome of the reconciliation process. It's about your argument that there should have been one and there was one. Well, there is no final decision in the reconciliation process. So what? Is the decision subject to an appeal that's going on? Is that what it is? It is now before the hearing officer, the CMS hearing officer. I understand that. But that's not our problem now. Our problem now is whether this should have gone through the reconciliation process so that you could have your appeal. Well, it did go through the reconciliation process, and you are having your appeal. So why is that part of the case our problem now? Our view is the reconciliation process is ongoing. So you want to be able to have this money all during the reconciliation? Well, we believe we have spent substantial monies that have not yet been taken into account. I mean, and there are – I mean, when I said there are simple parts of this, we had new enroll – you know, when someone turns 65, they become eligible for Part D. So obviously that happens during the course of the year. We had enrollees assigned to our plan March 1 for whom we received no advance payment at all, and yet we obviously were fulfilling their drug needs for the first eight days of March. Tell me about that. That is an example of a cost that we incurred. Another example, if I could, just to sort of provide semi-bookends for this argument, is when CMS terminated us, they explicitly instructed us, you must stay in operation in order to deal with all the issues that Part D sponsors have to deal with on an ongoing basis, you know, essentially at least through the following year. You know, and yet – There was something a lot simpler than my 90-day pills example, and I – Enrollees for whom we got no payment at all is my simplest example of all. People who were assigned to our program affected March 1, 2010, for whom we provided drugs for March 1 through March the 8th. Oh, you mean somebody gets on Medicaid March 1, but you don't get your money March 1? Right. Because – exactly. Because they turn 65, so they are now – they turn 65 and – And why don't you get the money in? Why wasn't that in the calculation? It's out – I believe it's done after the – my understanding is that that would be done after the fact for anyone who just joined the system newly. I mean, were you arguing that – you were arguing that you wanted to keep the projected money that was for people who were in the system, even though you were terminated as of March 10th. And you were arguing as – also, as I understand it, as part of that, that that would be dealt with later on in the reconciliation process as to these kinds of problems. For example, you were covering people that you weren't paid for. But that has already happened. No? Your Honor, it depends upon how you define the reconciliation process to answer that question. Is it a certainty as a practical matter that Fox Insurance will be entitled to at least some money under the reconciliation process? Well, I don't – the argument is about how much. Your Honor, our view is the facts support that conclusion. I cannot claim that. Well, in fact, you were not. In fact, as it turned out, the government said that you owed them money. But that – but – I think I didn't make myself clear. Let me lay out for you what my thinking is so you can educate me. When you – when Fox gets fired March 10th, the agency has a liquidated claim immediately for March 10th through March 31st, or March 11th through March 31st, around $20 million. Now, what I'm thinking is, as of that date that Fox Insurance gets fired, it has an unliquidated claim for an amount as yet uncertain. And what I'm trying to find out is, is it virtually certain that Fox will be entitled to at least something that reduces the agency's $20 million claim so that it will be maybe $16 million, maybe $12 million, maybe $18 million, something like that. So you can't tell exactly how much the – you can tell how much you owe the agency March 10th, but you cannot tell how much the agency owes you March 10th. Is that the case? Well, there are components of our claim that we believe that amount was established as of March the 10th. Okay. So you don't like my formulation then? I mean, I was – what I was thinking was that it wouldn't be fair to charge you interest on $20 million as of March 10th if actually the net entitlement to the agency was only $16 million, even though that $4 million couldn't be determined with precision for another year and a half. But I think you're rejecting the suggestion that I make. Well, interest is – obviously is an issue, but I don't consider it to be our core issue. Well, interest is the only issue. It's not our core issue. Just a minute. My understanding is interest is the only issue. You have never paid this money back, right? You kept it all. Well. They said you sent us back the money, but you didn't send them back the money. You've never sent them back the money, right? Well, as I've said, we have incurred substantial expenses. I understand that. But they demanded a bunch of money and you did not send it back to them. We have said that it should go through the reconciliation process. I mean, that has been the case. I understand that. So basically you used self-help to keep the money. Not if one – we think the reconciliation process deals with this issue. I understand that. But you enforced your own view of the statute when the government's view of the statute was you – or was today, today you're supposed to give us back this money and later on, if we owe you money, we'll give it to you. That's their reading of the statute and that's what we're arguing about. But at this point, since you never gave back the money, in fact, the only thing that is at issue is some interest. Well, not if we have valid. I mean, it's not as a practical matter true that it's a virtual certainty that at the end of the whole reconciliation process, after it becomes final, you will owe the agency money, although it's also true to an almost certainty that the amount you owe the agency will be less than the $20 million they've claimed. Well, there – it's not a certainty. It's not a near certainty as to those issues, no. We have identified errors in their calculation of, for example, this practice. But that part of the case is not before us, right? I was simply responding to the question asked. We – we – we – Do you think the agency may owe you money or you think you may owe the agency more money? Well, we – we have advanced arguments as to why we believe they owe us money that would – that would equal if not exceed the amount of money they've asked for from us. I mean, that's the simplest way to answer the question. Can you clear our reserves in time? You have a minute and 20 seconds left. Thank you very much. Thank you again, Your Honors. Just to start with Judge Kleinfeld's question first. I think it's virtually certain that reconciliation will show that Fox owes us money, additional money over and above the 20 million that they owe us, the 20 million – now 16 million or so that they owe us. Oh, this is much more disparate than I thought. I thought the way it looked was if they lost on their appeal, you would owe them about 16 million. You would – you were entitled to 20 million minus the 4 or so that the reconciliation knocked out of it. No. So the way that it worked, if I could just be clear, is that as of March 10th, they had in their possession about 20 million dollars. Just for my benefit, start from the beginning and go a little chronologically as to what is here so that we can get to the end of what's really at stake. Yeah, absolutely, absolutely. I think what's troubling us all. Yes, okay. So what Fox received before March 2010 was about $30 million that was going to be It was an estimate. It was an estimate. Yes, exactly right, Your Honor. And then – but they did not – it's undisputed that they didn't provide that coverage over – in March 2010. They were terminated on March 9th. And so at that point, they had about 20 million dollars in their possession that a regulation that's specifically on point says that we're entitled to. And the – I can read the regulation. We cite it in our brief. I can read the regulation if you want. It says – It's pretty obvious. It's pretty obvious that we're entitled to. They're supposed to give it back then. Then. Exactly. Because at that point, there's no question. I don't think the regulation says then. It says you're entitled to the money. It doesn't say they have to pay it back immediately and do the reconciliation later. Well, it creates the right to recovery when termination is effective in the middle of the month. And it does it without caveat. The regulation would be pointless if all it did was sort of acknowledge a right to recovery because it's obvious that they owe us money. No, it wouldn't be pointless at all. People have rights all the time, and they're fully vested immediately. But that doesn't mean that no setoff can be asserted. Typically, in modern procedure, if you have a right to a certain number of dollars from a party, you bring a lawsuit. And then if the party has a right to some setoff or recoupment from you, they bring a counterclaim. And then the court decides, whatever impartial tribunal there is, in this case, probably the reconciliation process decides, at the end of the claims and counterclaims, who owes who how much. Well, the reconciliation process does not account for, and maybe this is part of the confusion, the reconciliation. They don't need to reconcile the capitation because that's simple arithmetic. The point, exactly, because that amount is already calculated. What reconciliation is about is about calculating, comparing, reconciling the estimated payments. Breyer, what is the difference between a liquidated claim set off by an unliquidated claim? No. What the reconciliation does, what it compares is the estimate. And it reconciles it with the amount of coverage actually provided by Fox Insurance Companies. So it wouldn't count for the rest. Kagan, your vision is that the money that is paid prospectively on a capitation basis, they can keep for every day that they're recovered, but that this is not money that goes into the reconciliation process. Exactly. As such, or is set off against, the set-offs occur with regard to the money they did receive and were entitled to have. But this is money that they were just not entitled to have and that they have to give back at that point, not later. That is exactly right. And that's why they're not usually used. Let's ask – I just want to ask one thing. Supposing that there's a problem with that. The fact is they didn't give it back. That's exactly right, Your Honor. And, in fact, where we are now is that the process is, as a practical matter, operating in the way that Judge Kleinfeld is positing, because they didn't give it back. So, therefore, it's all essentially in the reconciliation process, even though, in your view, it shouldn't have been. It's actually not. It wasn't calculated as part of the actual reconciliation done by CMS, because CMS operated the reconciliation under its view of how reconciliation operates. It took into account sort of the amount of estimated payments received up until March 9th, for the full year up until March 9th. So this $20 million is still off in the sky. It's not in the process. Exactly. That's separate and apart from the amount that they owe us as part of the reconciliation. Ultimately, the reconciliation showed that they owed us an additional $27 million. That's what the reconciliation showed. So they now owe us ---- I thought it went down from 20 to 16. You're saying that was ---- So if I could go through. I'm sorry. My timeline was interrupted. So what happened is, as of March 10th, they owed us $20 million. And then in the fall, the reconciliation from the prior year, from 2009, was completed. And that showed that we owed Fox $4 million. And so we, at that point, at that point, there was a sort of, if you will, a liquidated claim. It was clear that we ---- it was established that we owed Fox money. I see. And so that's what we offset against the $20 million. This $27 million, I submitted this in a letter to the Court on February 22nd. The letter that I submitted that was the result of the reconciliation for 2010, not for 2009, for 2010, showed that they owed us $27 million, an additional $27 million. And so I think what that ---- what the reconciliation ---- and that was affirmed or they sought reconsideration within CMS. CMS fully affirmed. Okay. I get it now. And they're contesting that. Now, let me ask you my question. Usually, when you've got ---- when each party is at least potentially a creditor of the other, and one has a liquidated, the other has an unliquidated claim, and the creditor has a right to sue, and the debtor on that claim, who's a creditor on unliquidated claims, has a right to bring counterclaims, the only way ordinarily that the creditor on the liquidated claim can grab the money immediately without getting the claims on both sides to judgment is with some sort of preliminary order or receivership. A preliminary injunction, a receivership, something so that the money won't disappear while the litigation is pending. I don't really see why this should be different. Well, this is where the Federal Government has said things operate a little bit differently. There's a ---- the regulations ---- The way they operate different is ultimately subject to what the courts say as well as what the agencies say. What we would do ---- what we would do, what we did is we made a demand letter to Fox. That's what's on review here. And that's how agencies ---- we made the demand letter, which Fox chose not to ---- Now, this was the demand letter ---- help me with the chronology again. I, yeah. This is the demand letter after the termination, and you had paid for the entire month, and the termination had taken place a third of the way into the month. That's right. I mean, technically speaking, right, yeah. And the demand letter said, pay us back the rest of the money. Exactly right, Your Honor. Exactly right. And ---- So what would ---- I'm sorry. They didn't. They didn't. And what would ordinarily happen, instead what they did is they filed this lawsuit. And ordinarily what would happen is that if they didn't pay and they didn't file a lawsuit, we would go to court and file a debt collection action. There's an entire statute that governs how the Federal government collects its debts. And none of that's been really briefed or discussed in court. And so ---- but that's the process that we would go through. I think even in your hypothetical, though, Your Honor, I would stress that there would owe us the money as of the date of the demand letter. Sure, they would. But all that does ordinarily is affect interest. You still don't usually get to issue a levy of execution or a garnishment of a bank account without getting a court to issue the papers for you. Yeah. If they did ---- if they were not to volunteer the money after this Court affirms the district court's judgment, I think that we would have to engage in sort of debt collection act. Wait. Okay. So they've still got the money? Yes. And this litigation is continuing. And their claim now is that they are entitled to keep that money until the reconciliation is complete. That is absolutely their claim. That's right. Okay. Now the reconciliation process, I mean, I guess it's not finished because there's still an appeal going on. There's still an administrative appeal. It's before a hearing officer, a CMS hearing officer. And so really I think what Your Honor was pointing out is that the only thing the thing that's keeping this case alive to the extent it is alive is the issue of interest. Interest meaning that the government wants interest on the money that they should have paid back to the government? As of the date of our demand letter. That's exactly right. What is the regulation that you're relying on? Yeah. I'm happy to read it. It is 42 CFR 423.509B2i. And it says if termination is effective in the middle of a month, CMS has the right to recover the prorated share of the capitation payments made to the Part D plan sponsor covering the period of the month following the contract termination. So that what that does is that it establishes that right effective the date of the termination. And so the regulation, as interpreted by the Secretary, I would point out, and we're entitled to deference for the interpretation of our own regulation. Sure, your right vests that day to the money. It doesn't mean you actually get the money. It means you have a vested right to the money. That's right. But, you know, we would have to engage in, as I said before, if they refuse to pay, we'd have to engage in debt collection activities. But it wouldn't diminish our right to the money as of that date. And whatever associated interest and penalties and costs of it. And minus whatever, it turned out, you owed them. If there – if during that period reconciliation were completed, yes, of course. And it showed that you owed that money. Now, maybe minus a negative figure, which means you'd be entitled to even a greater amount. That's right. That's right. Aren't you also concerned that the money might disappear? We are. We are quite concerned about that, Your Honor. And so that's why we need to – we want to establish that. In the case of the company receivership program, I recall this with liability insurers. Every State I think has a liability insurer receivership program, especially for that, to make sure the money doesn't disappear and is there to pay people who are entitled to money from the failing insurer. That's a very good question, Your Honor. I'm aware of what you're talking about. I don't know how that would apply. I think that's on a State basis. Yeah, it is on a State basis. I mean, certainly California has such a system, but I don't know that it's a national institution. Yeah, I agree with that. You know, these insurance companies are regulated by the States as well. So I actually don't know how that would apply in this context. I apologize. And whether or not you could have gone in with some procedure to physically get the money or to get the money paid back early, you didn't do that. No, we didn't do that, partly because we wanted to resolve this litigation before we started sort of duplicative debt collection, a debt collection action. You know, we wanted to get resolved the arguments that they're raising here. And that's the agency's fault. I do hope that your agency is looking into both reporting procedures in case there are deaths so that prosecutors can learn of them, and also is looking into the receivership statutes in order to protect its money. I'm sorry, you're asking me if the agency is looking, is? If people violate the law when they know they're willfully violating the law and they're willfully endangering other people's safety and it materializes in people's deaths, that can be a crime for the individuals and the company. Yes. If an agency is entitled to money from an insurance company and the insurance company is failing, it may be that state receivership statutes entitle the agency to get a receivership imposed to tie up the money so that the money isn't dissipated while the dispute is litigated. And I was asking whether any of those things are proceeding, and it sounds like no. The answer is I don't know. I mean, to be honest, this goes beyond sort of what's been briefed in this case, and I can't represent what how CMS handles these situations. Is FOX an ongoing enterprise? As far as I'm aware, and Mr. Rosenbaum can tell us. That is a little mysterious, because the representation was that it was kind of a new company formed for this very purpose and this is all it did. So it's a little – I was wondering, you know, who's here litigating? I don't really understand it very well. Again, we're not – I mean, this case was before this Court on a preliminary injunction, and in that case, they argued that if the preliminary injunction was not granted, and it was not granted, this Court denied the injunction, that they would be rendered a shell of a company. And so, you know, I think that goes to the point that even if they were correct about all of their arguments on termination, it's not clear that this Court could order the reinstatement of FOX Insurance Company if it's indeed just a shell now. But again, I have no information about that, and I assume Mr. Rosenbaum might. Okay. Thank you very much. Thank you very much. Your Honor, questions about recoupment, you know, really are, I think, the heart of our position, as well as, of course, an application of the regulatory language. We do think we are entitled to assert through the reconciliation process our positions as to why we think monies are owed us by CMS, and that the process is the one to be followed, and that's the process we have been following. I think that those concepts of recoupment, which we, of course, also talked about in our briefs, are the ones that we think underlie the – you know, that those general principles are not to be read out in regulations. As – assuming, and I – as I understood what Judge Kleinfeld was saying, whether you had to return the money at March 10th or not, and I think the scheme may be different, but in any event, you owed it as of March 10th, so the interest would accrue as to March 10th, and I don't see the difference in outcome as since you never paid the money back. Since you never paid the money back, the case is still only about interest, and whichever way you look at it, the interest would have accrued. Roberts. Well, I mean, not – not if we had already engaged in expenditures for which we hadn't been paid as of March the 10th. Wouldn't the right answer be the interest on their claim accrues from March 10th, and after the reconciliation is all over a year and a half later, the interest on your claim also accrues from some much earlier date? I don't know if it's March 10th or some other date, because even though, you know, it's not liquidated until the later date, it's liquidated as an amount owing as of some earlier date. That's one way to characterize it, Your Honor. Another would simply be to say, if we owed the government $10 million on March 1 and they owed us $10 million on March 1, nobody owes interest to anybody. I mean, that's another way to conceptualize this. Well, actually, you could also say each owes the other interest, and they wind up being the same amount. Except that the actual outcome of the reconciliation was they don't owe you anything, you owe them $27 million, as of now. Well, as of now, that's the claim that they asserted. That includes interest claims and penalties and other things of that nature. This is an administrative claim, and it's currently going through a process where you appeal to a hearing officer and then to some board? The hearing officer and then to the Secretary.  Well, we have an amount of money. March? I mean, we obviously have spent money on, as I've said before, we were required to continue an operation for another 15 months. We had incurred upfront expenses in January of 2010 that every fiscal year you incur substantial expenses in January that you are going to recoup through payments you receive over the course of the year. We obviously didn't receive those payments because of the termination. So these all, you know, those are monies that float out. Okay. Thank you very much. Thank you to the parties in these two cases. Fox Insurance Company v. Centers for Medicare and Medicaid Services. The two cases are submitted.
judges: Schroeder, Kleinfeld, Berzon